## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RHINO ASSOCIATES, L.P.,** | : | **CIVIL ACTION NO. 1:04-CV-1611** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **BERG MANUFACTURING AND** | : | |
| **SALES CORPORATION and** | : | |
| **CENCOR PLASTICS, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Presently before the court are three motions for summary judgment filed by plaintiff Rhino Associates, L.P. ("Rhino").  Rhino seeks judgment in its favor on its claims of patent infringement and willful infringement against Berg Manufacturing and Sales Corporation ("Berg")[1] and its claim of patent validity and enforceability. Also before the court are the parties' contentions regarding the proper interpretation of claim terms.

For the following reasons, the motions will be granted in part and denied in part.

---

[1] After the filing of the motions for summary judgment and the hearing on claim construction and the motions, Cencor Plastics, Inc. ("Cencor") was consensually added as a defendant.  (<u>See</u> Docs. 101, 102.)  Cencor had previously purchased all right, title, and interest in the assets of Berg.  (<u>See</u> Doc. 102 ¶ 22; Doc. 105 ¶ 22.)  Cencor stipulated that it did not intend to file supplemental information regarding the pending motions for summary judgment and that the court could decide these motions based on the information provided by Rhino and Berg.  (<u>See</u> Doc. 101 ¶ 8.)  For simplicity, although Cencor is now a defendant in this action, the court will refer only to Berg throughout this opinion.

I.    **Statement of Facts**[2]

The patent *sub judice* (patent no. Re. 34,889, hereinafter "the '889 patent")

covers a "lightweight, high strength, portable vehicle service ramp capable of being

used by aerodynamic vehicles and heavy trucks."  (Doc. 1, Ex. A.)  It was re-issued

to principals of Rhino, William W. Fogarty and Phillip M. Friday, in 1995.[3]  (Doc. 1,

Ex. A.)

The '889 patent encompasses ten claims, five of which Berg is alleged to have

infringed.  The claims at issue are as follows:

1.    A lightweight, high strength, vehicle service ramp to elevate and
      support vehicles that they may be serviced, comprising,

      (a)    an exterior structure formed with vertical sides which are
             the outermost longitudinal support members, and rear,
             which is the outermost transversal support member,
             including an inclined top surface sloping upwards toward
             a top flat plane surface,

      (b)    a system of interlocking vertical cross members running
             longitudinally and transversely throughout the length and
             width of the structure from which the ramp derives the
             strength to support vehicles as they are being elevated
             and stopped,

      (c)    a system of interlocking cross members serving as
             support members with individual members running
             longitudinally and transversely, formed with the
             outermost longitudinal support members serving as

---

[2] In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to the non-
moving party.  See infra Part II.

[3] The original patent (patent no. 5,033,146) was issued in 1991.  (Doc. 1, Ex. A;
Doc. 34 ¶ 10; Doc. 78 ¶ 10.)

vertical side walls and the outermost integrated transversal support member serving as the vertical rear wall,

(d)     internal cross members serving as the support structure, comprised of longitudinal and transversal members with longitudinal members extending lengthwise throughtout [sic] the interior of the structure, being tapered toward the lowest end of the member and being fashioned in such a manner as to accommodate interlocking transversal members that extend widthwise the interior width of the structure and are of a height and [b]evelled in such a manner as to conform to the plane and incline of the longitudinal members creating an interior support structure that is integrated into the interior of the structure,

(e)     means interconnecting all internal interlocking longitudinal and transversal cross members with the sides, incline, rear and top plane of the structure to form a structure that is essentially one piece and that is of an incline and of sufficient height that motor vehicle tire secure purchase throughout their upward travel from the lowest portion of the inclined surface until the vehicle's tire are resting on the top flat plane surface,

(f)     a base comprised of the lowermost portions of the interlocking internal and external longitudinal and transversal members,

(g)     stop means provided, situated forward of rear member and formed on its rearward surface in such a configuration to [s]tabilize the structure when transporting or storing vertically.

2.     The ramp of claim 1 wherein the structure is comprised of a plastic type compound.

* * *

6.     A lightweight, high strength vehicle service ramp to elevate and support vehicles that they may be service[d], comprising;

3

(a)     an exterior structure formed w[i]th generally vertical sides, including an inclined top surface and a flat top surface;

(b)     a honeycomb system of interlocking members disposed through-out the length and width of the structure from which the ramp derives the strength to support vehicles as they are being elevated and stopped, said system comprising interlocking longitudinal and transversal cross members serving as support members wherein in the outermost longitudinal support members serve as vertical side walls and the outermost integrated transversal support member serves as the vertical rear wall; and

(c)     means interconnecting all internal interlocking longitudinal and transversal cross members with the sides, inclined, rear and top surface of the structure to form a structure that is essentially on[e] piece and that is of an incline and of sufficient height that motor vehicle tires secure purchase throughout their upward travel from the lowest portion of the inclined surface until the vehicles tires are resting on the flat top surface.

* * *

8.     A lightweight, high strenght [sic] vehicle service ramp to elevate and support vehicles that they may be serviced, comprising:

(a)     an exterior structure formed with generally vertical sides, including an inclined top surface and a flat top surface;

(b)     a honeycomb system of interlocking members disposed through-out the structure from which the ramp derives the strength to support vehicles as they are being elevated and stopped, said system comprising interlocking cross members serving as support members wherein the outermost longitudinal support members serve as vertical side walls and the outermost integrated transversal support member serves as the vertical rear wall; and

(c)     means interconnecting all internal interlocking longitudinal and transversal cross members with the

4

> sides, inclined, rear and top surface of the structure to form a structure that is essentially one piece and that is of an incline and of sufficient height that motor vehicle tires secure purchase throughout their upward travel from the lowest portion of the inclined surface until the vehicles tires are resting on the flat top surface.

9.   The ramp of claim 8, wherein the structure is comprise[d] of a plastic type compound.

(Doc. 1, Ex. A at cols. 4-6.)[4]  The '889 patent also includes a detailed specification section, containing descriptions and illustrations of the invention.  (Doc. 1, Ex. A.)

Berg has made two versions of a plastic vehicle service ramp—a 12,000 pound ramp and an 8,000 pound ramp (collectively, "the Berg ramps").  (Doc. 32 ¶¶ 22, 24, 34, 41; Doc. 74 ¶¶ 22, 24, 34, 41.)  The Berg ramps are comprised of three individual components (referred to as the platform, incline, and extension by Berg's expert, Dr. Shon W. Yim).  (Doc. 32 ¶¶ 28, 31, 45; Doc. 74 ¶¶ 28, 31, 45; Doc. 74, Ex. D at 6.)  Berg marketed its ramps as "3-Piece Self-Locking Modular" systems.  (Doc. 32 ¶ 31; Doc. 74 ¶ 31; Doc. 74, Ex. E.)  The platform and incline components are "self-locking" with a dowel and pin structure.  After these components are assembled by the joint, they can be disassembled.[5]  (Doc. 32, Ex. D at 47; Doc. 32, Ex. J at 15-16.)

On July 22, 2004, Rhino commenced the instant action.  (Doc. 1.)  Rhino subsequently filed motions for a temporary restraining order (Doc. 40) and a

---

[4] Claims 1, 6, and 8 are independent claims; claims 2 and 9 are dependent claims.

[5] Rhino states that, after the components are assembled, "[t]here is no need to take the pieces apart and [it] is difficult to do so."  (Doc. 32 ¶ 30.)  This statement acknowledges that the ramp can be disassembled, albeit with difficulty.

preliminary injunction (Doc. 42) on June 30, 2005.  Following telephone conference

hearings on the motions, the court granted the motions and enjoined Berg from,

*inter alia*, making, using, offering to sell, or selling the alleged infringing product.[6]

(See Doc. 44 ¶ 1; Doc. 48 ¶ 1.)  Rhino also filed three motions for summary judgment:

(1) motion for summary judgment of willfulness (Doc. 26), (2) motion for summary

judgment of validity and enforceability (Doc. 27), and (3) motion for summary

judgment of infringement (Doc. 28).  The parties have fully briefed the issues and

the court held a hearing on claim construction and the motions for summary

judgment.  The motions are now ripe for disposition.

## II.   Standard of Review

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to adduce "affirmative evidence, beyond the

allegations of the pleadings," in support of its right to relief.  Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

---

[6] The court subsequently denied Berg's motion (Doc. 66) to dissolve the preliminary injunction.  (See Doc. 87.)

also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

**III.   Discussion**

In granting persons the "exclusive Right" to the use of their discoveries for a

limited time, patent law promotes public innovation by rewarding individual

inventors with a limited monopoly over their designs.  U.S. CONST. art. I, § 8, cl. 8;

Mazer v. Stein, 347 U.S. 201, 219 (1954) ("The economic philosophy behind the

clause empowering Congress to grant patents and copyrights is the conviction that

encouragement of individual effort by personal gain is the best way to advance

public welfare through the talents of authors and inventors in 'Science and useful

Arts.'").  To obtain a patent, the inventor must clearly and expressly define the

scope of his or her claim in the patent application, making what was previously

secret and innovative at once known and ascertainable to the general public.

35 U.S.C. § 112; Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996).  In

exchange for this disclosure, the patent vests its holder with the ability to challenge

and enjoin the development or sale of competing designs that infringe upon the

patented claims, ensuring that only the holder will derive the financial benefits

from the invention.  29 U.S.C. §§ 281-284; Mazer, 347 U.S. at 219 ("Sacrificial days

devoted to such creative activities deserve rewards commensurate with the services

rendered."); Grant v. Raymond, 31 U.S. (6 Pet.) 218, 242 (1832) (mem.) ("[The

patent] is the reward stipulated for the advantages derived by the public for the

exertions of the individual, and is intended as a stimulus to those exertions.").

Thus, the patent process presents a two-edged sword.  On the one side, it advances innovation by ensuring that individuals who invest time and resources into production of a new design receive the benefits of the sale and marketing of that device without unfair appropriation by competitors.  On the other side, it suppresses innovation by discouraging those working in related fields from examining and developing designs that could possibly be viewed as infringing upon the patented claim.  At the essence of patent law is this inherent tension between the need to protect inventors and the desire to permit continued work in related fields.  Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63 (1998) ("[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.").

To accommodate these competing principles, patent law places primary reliance on the terms of the patent itself.  Markman, 517 U.S. at 388-91.  In the "claims" section of the patent, the inventor must expressly define the elements and limitations of the design, "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112.  Further, the inventor must explain in detail the specifications of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same."  Id.  By focusing on the claims advanced in the patent, and limiting its scope to the language employed by the inventor, courts may give full effect to the inventor's original intent while preserving the ability of other

8

individuals in related fields to continue their work without fear of unintentional infringement.  Pfaff, 525 U.S. at 63.

The necessity of uniformity and certainty in this determination, and the nature of the determination as more akin to statutory interpretation than factual finding, mandates construction of claim language by the court, not the jury, as a question of law.  Markman, 517 U.S. at 390-91.  Thus, as a threshold matter in any patent case, whether dealing with alleged infringement of a patent by another party or with the asserted invalidity of the patent itself, the court must determine the nature and scope of the claims advanced by examining the language used in the patent.  Id.; Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003).  Accordingly, the court will construe the disputed claim terms before addressing the motions for summary judgment.

## A.    Claim Construction

An inventor may assert ownership only over those designs encompassed within the claims section of the patent.  See 35 U.S.C. § 112; Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63 (1998); Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005).  The proper construction of claims is a question of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  It requires the court to determine the "ordinary and customary meaning" of the claim terms as they would be understood by "a person of ordinary skill in the art"  Phillips, 415 F.3d at 1312-13; see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 290 F. Supp. 2d 508, 519 (M.D. Pa. 2003).  This meaning

should be discerned, if possible, from intrinsic evidence, i.e., the language of the patent and its prosecution history.  See Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352, 1355-56 (Fed. Cir. 2004); Novartis Pharm. Corp. v. Abbott Labs., 375 F.3d 1328, 1334-35 (Fed. Cir. 2004).  The specification "is the single best guide to the meaning of a disputed term."  Phillips, 415 F.3d at 1315.  Only if these sources do not yield a clear definition should the court explore other extrinsic sources, such as dictionaries and expert testimony, to resolve the meaning of an ambiguous term. See Home Diagnostics, 381 F.3d at 1355-56.

Four claim terms of the '889 patent are in dispute:  "interlocking . . . members," "throughout,"  "means interconnecting," and "essentially one piece."[7] (See Docs. 31, 72, 75, 81, 91).  The court will examine them *seriatim.*

---

[7] Claims 6 and 8 include the term "honeycomb," which Rhino seeks to have the court construe.  Because Berg did not oppose Rhino's construction, the court will construe "honeycomb" to mean "a structure or configuration having many small units or holes," as proposed by Rhino.

1.    <u>**"Interlocking . . . Members"**</u>

The term "interlocking . . . members"[8] is used in all of the independent claims at issue.[9] Rhino contends that this term means "distinct parts of a whole which intersect and are closely joined." (Doc. 81 at 8.) Berg argues that this term should be construed as "separate individual pieces or parts, distinct from the structure as a whole, that interlock to each other to form an interior structure." (Doc. 75 at 8.) The language of the claims and specification supports a definition that excludes Berg's proposed limitation requiring separate individual pieces.

Berg argues that interlocking "only makes sense . . . if the term refers to separate individual pieces." (Doc. 75 at 9.) In support of this argument, Berg quotes language from claim 1, which reads "cross members . . . being fashioned in such a manner as to accommodate interlocking transversal members." (Doc. 1,

---

[8] Berg seeks construction of the specific phrase "interlocking vertical cross members." (Doc. 75 at 8.) However, this specific phrase is used only in claim 1, subpart (b). (Doc. 1, Ex. A at col. 4, line 46.) Claims 1, 6, and 8 also use the phrases "interlocking cross members," "interlocking longitudinal and transversal cross members," and "interlocking members." (Doc. 1, Ex. A at cols. 4-6.) In its brief in opposition to Rhino's proposed claim construction, Berg refers to claims 1, 6, and 8 with respect to its proposed construction of this specific phrase. Therefore, the court will construe the general term "interlocking . . . members" to cover all variations of the term in claims 1, 6, and 8.

[9] The parties agree that the term "interlocking" means "to engage or interlace, one with another." (Doc. 32 ¶ 51; Doc. 74 ¶ 51.)

Ex. A at col. 58-64.)[10]  Berg also refers to figures 4 and 5 of the '889 patent, which illustrate separate, individual cross members.  This argument, however, disregards the language of the *entire* '889 patent.  See <u>Phillips</u>, 415 F.3d at 1313 ("[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the *context of the entire patent, including the specification*." (emphasis added)).

The '889 patent clearly discloses, and claims, a plastic molded ramp. Language from claim 1, as Berg cites, certainly cannot be used to impose a limitation on the phrase "interlocking . . . members" in claims 6 and 8.  See <u>Callicrate v. Wadsworth Mfg., Inc.</u>, 427 F.3d 1361, 1371 (Fed. Cir. 2005) ("[T]his court interprets claim terms consistently throughout various claims of the same patent."). The same can be said for a limitation appearing in drawings of a particular embodiment of the invention.  A person of ordinary skill in the art reading the phrase "interlocking . . . members" in the context of the entire '889 patent would not impose the "separate individual parts" limitation, as such a limitation is inconsistent with a plastic molded ramp.

---

[10] Berg also states that the claims use both"interlocking" and "interconnected" to describe the relation of the cross members.  (<u>See</u> Doc. 75 at 8-9.)  However, the term "interconnected" is used only to describe the connection between the cross members and the sides, inclined, rear, and top surfaces of the ramp.  (<u>See</u> Doc. 1, Ex. A.)

Accordingly, the court will construe "interlocking . . . members" as "distinct parts of a whole, not necessarily separate individual parts,  which engage or interlace, one with another."

  **2.**  **"Throughout"**

The term "throughout" is used in all of the independent claims at issue.[11] Rhino argues that the term should be construed as "ever present." (Doc. 81 at 13; Doc. 91 at 50.)  Berg seeks a narrower definition and contends that "throughout" means "continuously and uninterrupted from the front of the ramp to the back of the ramp."  (Doc. 75 at 12.)  Such a narrow definition is unsupported by the language of the claims and specification.

Berg argues that the specification requires the "continuously and uninterrupted" limitation because the specification notes the importance of cross members extending throughout the structure to provide the structure's strength. Berg quotes the following language from the specification to support its argument:

> As shown in FIG. 2, the base 8 of the structure allows greater contact with the ground, thus lessening the tendency for movement when driven upon; and displacing weight more evenly to avoid damaging asphalt and other surfaces.

---

[11] Claim 1 reads:  "interlocking vertical cross members running longitudinally and transversely *throughout* the length and width of the structure" and "longitudinal members extending lengthwise *throughtout* [sic] the interior of the structure."  (Doc. 1, Ex. A at col. 4, lines 46-48, 60-62 (emphasis added)).  Claim 6 reads:  "interlocking members disposed *through-out* the length and width of the structure."  (Doc. 1, Ex. A at col. 5, lines 35-37 (emphasis added)).  Claim 8 reads: "interlocking members disposed *through-out* the structure."  (Doc. 1, Ex. A at col. 6, lines 20-21 (emphasis added)).

> As shown in **FIG. 3**, the structure's strength is derived from a system of *interlocking vertical cross members 9, 10 which run longitudinally and transversely throughout the inside of the ramp.*

(Doc. 1, Ex. A at col. 3, lines 47-55 (emphasis added)).  This language does not help define the term "throughout" in the claims; it merely tracks the language in claim 1, which reads:  "interlocking vertical cross members running longitudinally and transversely throughout the length and width of the structure."  (Doc. 1, Ex. A at col. 4, lines 46-48.)  That the language surrounding the term "throughout" in claims 6 and 8 is different, see supra note 11, supports the conclusion that this specification language does *not* add the "continuously and uninterrupted" limitation to the term "throughout."  Nothing in the specification or accompanying drawings, which clearly refer to the preferred embodiment of the invention, requires the limitation proposed by Berg.  See Callicrate, 427 F.3d at 1368 (noting that it is improper to import a limitation from the specification into the claims and to limit claims to the preferred embodiment).

Accordingly, the court will construe "throughout" as "ever present."

### 3.    "Means Interconnecting"

The phrase "means interconnecting" is used in all of the independent claims at issue.  The parties do not dispute that this phrase is a means-plus-function element pursuant to 35 U.S.C. § 112 ¶ 6.  The court agrees.  The use of the term "means" creates a presumption that 35 U.S.C. § 112 ¶ 6 applies.  See Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1361 (Fed. Cir. 2000).  This presumption

has not been rebutted because the claims at issue do not specify a "sufficiently definite structure to perform the claimed function."  Id.

Construing a means-plus-function element involves two steps:  "First, the court must determine the claimed function.  Second, the court must identify the corresponding structure in the written description of the patent that performs that function."  Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006); see also 35 U.S.C. § 112 ¶ 6 ("[A means-plus-function] claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.").  A means-plus-function element covers the corresponding structure disclosed in the specification and that structure's equivalents.[12]  See Kwik Prods., Inc. v. Nat'l Express, Inc., 179 F. App'x 34, 38 (Fed. Cir. 2006) (citing Personalized Media Commc'n, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 703 (Fed. Cir. 1998)); see also 35 U.S.C. § 112 ¶ 6.

With respect to the first step, the court finds that the claimed function is "interconnecting all internal interlocking longitudinal and transversal cross members with the sides, inclined, rear and top surface of the structure to form a

----

[12] Determining a structure's equivalents is not a claim construction issue; it is a question of fact.  See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268-69 (Fed. Cir. 1999).

structure that is essentially one piece."[13]  To determine the corresponding

structure, the court must examine the '889 patent's specification.  The specification,

in pertinent part, states as follows:

> [T]he structure's strength is derived from a system of interlocking
> vertical cross members which run longitudinally and transversely
> throughout the inside of the ramp.  Individual members are wall type
> structures.  The outermost transverse support members serve[] as
> vertical side walls.  The outermost traverse support members serves as
> the vertical rear wall.  Internal crossmembers are integrated into the
> base, incline, top plane, rear, and sides.  All components are held
> together by screws and by a waterproof glue type compound that is
> applied at all points of contact making the entire structure essentially
> one piece.
>
> Preferably, the entire structure is made of very dense wood such
> as marine grade plywood, sealed and painted or a mold of the
> structure could be formed of a high strength plastic type compound.

(Doc. 1, Ex. A at col. 3, lines 52-68.)

Based on this language, Rhino argues that the corresponding structures are

screws, adhesive compound, and/or plastic.  (Doc. 72 at 10-12; Doc. 31 at 10-11.)

Berg contends that the corresponding structures are only screws and glue.  (Doc. 75

---

[13] In papers submitted to the court, the parties agree that the claimed
function is "interconnecting all internal interlocking longitudinal and transversal
cross members with the sides, inclined, rear and top surface of the structure to form
a structure that is essentially one piece *and that is of an incline and of sufficient
height that motor vehicle tires secure purchase throughout their upward travel from
the lowest portion of the inclined surface until the vehicles tires are resting on the flat
top surface*."  (Doc. 32 ¶ 54; Doc. 74 ¶ 54 (emphasis added)).  However, the
emphasized portion of this language regarding the incline and height of the ramp
bears no relation to interconnecting the internal interlocking cross members.
Instead, it involves the ramp as a whole.  Therefore, the court finds that this portion
cited by the parties is not part of the claimed function of the means-plus-function
element.

at 18; Doc. 74 ¶ 55.)  The former interpretation is required by the specification.

Neither party disputes that screws and glue are corresponding structures and the

court agrees.  Therefore, the court's analysis will focus solely on plastic as a

corresponding structure.

For a court to find that a structure disclosed in a patent's specification is a

corresponding structure, "the specification or prosecution history [must] clearly

link[] or associate[] that structure to the function recited in the claim."  Default

Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1298

(Fed. Cir. 2005); see also id. ("This duty to link or associate structure to function is

the quid pro quo for the convenience of employing § 112, ¶ 6.").  Berg relies on this

language to argue that the specification's reference to a plastic molded ramp does

not clearly link or associate plastic to the claimed function.  However, this argument

ignores the overarching requirement that "whether sufficient structure has been

disclosed to support a means-plus-function limitation" is determined from the

perspective of "one skilled in the art."  Atmel Corp. v. Info. Storage Devices, Inc.,

198 F.3d 1374, 1379 (Fed. Cir. 1999).  The specification at issue clearly discloses a

plastic molded ramp.  (See Doc. 1, Ex. A at col. 3, lines 67-68.)  Limiting the

corresponding structures to screws and glue completely disregards this

embodiment of the invention.  See Bausch & Lomb Inc. v. Moria S.A., 222 F. Supp.

2d 616, 631-32 (E.D. Pa. 2002) ("If a specification includes multiple embodiments,

the claim element is to embrace each of those embodiments." (citing Micro Chem.,

Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999))).  Given this

clearly disclosed embodiment, "one skilled in the art" would recognize that plastic

is the *only* structure that could perform the claimed function in a plastic molded

ramp.  Therefore, the court finds that "one skilled in the art" would determine that

plastic is also a corresponding structure to the claimed function.

Accordingly, the court finds that the"means interconnecting" means-plus-

function element covers:  (1) screws and a waterproof glue type compound,

(2) plastic, or (3) their equivalents.

### 4.    "A Structure That Is Essentially One Piece"

The phrase "a structure that is essentially one piece" is used in all of the

independent claims at issue.  Rhino argues that this phrase should be construed to

cover a structure "that is basically, fundamentally, substantially or virtually a single

piece in its basic form or use."  (Doc. 31 at 11-12; Doc. 81 at 11-12.)  Berg contends

that the phrase means "a structure assembled from separate individual components

using both screws and a waterproof glue type adhesive to form a permanent one-

piece structure that cannot be disassembled."  (Doc. 75 at 19-20.)  Neither proposed

construction is supported by the language of the claims and specification.

As discussed <u>supra</u> Part III.A.1, Berg's proposed "separate individual

components" limitation is inconsistent with the entire '889 patent, which clearly

discloses and claims a plastic molded ramp.  Likewise, Rhino's attempt to define

"essentially one piece" as referring to the structure while it is in use is unavailing.

Within the claims of the '889 patent, this phrase is only used as part of the claimed

function of the means-plus-function element, <u>see</u> <u>supra</u> Part III.A.3, as follows:

> [M]eans *interconnecting* all internal interlocking longitudinal and
> transversal cross members with the sides, inclined, rear and top [plane
> or surface] of the structure *to form a structure that is essentially one
> piece* . . . .

(Doc. 1, Ex. A at cols. 5-6 (emphasis added)).  As is clear and unambiguous from this

claim language, "essentially one piece" does not refer generally to the ramp while it

is in use; it refers to the ramp after it has been constructed or assembled with the

corresponding structures defined <u>supra</u> Part III.A.3.  This conclusion is buttressed

by the language in the specification.  Like in the claims, the specification's only

reference to an "essentially one piece" structure involves the construction of the

ramp: "All components are held together . . . making the entire structure essentially

one piece."  (Doc. 1, Ex. A at col. 3, lines 61-64.)

Accordingly, the court will construe "a structure that is essentially one piece"

as "a structure that is basically, fundamentally, substantially, or virtually a single

piece after being constructed or assembled with (1) screws and a waterproof glue

type compound, (2) plastic, or (3) their equivalents."

**B.**     **Validity**[14]

Proof that a patent should not have been issued, and was thus invalid from

inception, defeats a claim of infringement.  See, e.g., Akamai Techs., Inc. v. Cable &

Wireless Internet Servs., Inc., 344 F.3d 1186, 1193-94 (Fed. Cir. 2003).  Federal

statutes establish several prerequisites to obtaining a patent, including, among

others, that the design be unanticipated and non-obvious.  35 U.S.C. §§ 102-103.

Because a patent is presumed valid, the challenging party bears the burden of

establishing invalidity by clear and convincing evidence.  Id. § 282; Union Carbide

Chems. & Plastics Tech. Corp. v. Shell Oil Corp., 308 F.3d 1167, 1187 (Fed. Cir.

2002).

---

[14] In its motion for summary judgment on validity and enforceability, Rhino also sought judgment on Berg's counterclaim, which alleges that the '889 patent is unenforceable due to inequitable conduct.  (See Doc. 33 at 12-13.)  Berg's brief in opposition (Doc. 79) did not address this counterclaim.  See L.R. 7.6.  In addition, during oral argument on the motions for summary judgment, Berg did not oppose summary judgment on this counterclaim.  (See Doc. 91 at 133-34); Jordan v. Stanziola, 96 F. App'x 839, 841 n.2 (3d Cir. 2004) (stating that a party had abandoned a claim when "counsel explicitly abandoned that claim at oral argument"); see also FED. R. CIV. P. 56(d).  Accordingly, the court will grant summary judgment in favor of Rhino on this counterclaim without further discussion.

In the matter *sub judice*, Berg asserts the invalidity of the '889 patent based on allegations that a prior patent (patent no. 4,836,501, hereinafter "the '501 patent") anticipated Rhino's design.[15]  The '501 patent makes the following claim:

A structure leveling device comprising:

an integral plastic member having a bottom surface and an upper surface, said bottom surface to rest on a supporting surface, said upper surface being divided into a plurality of levels of different heights, a portion of said structure being adapted to rest on one of said levels, said integral plastic member being hollow and formed of sheet material, said integral plastic member having side walls, said side walls being formed into a continuous corrugated configuration thereby enhancing the overall compressive strength characteristic of said structure leveling device, said corrugated configuration defining a plurality of grooves, all of said grooves being of the same size in transverse cross-section;

said hollow forming an internal chamber, a cross-brace arrangement formed within said internal chamber to also enhance the overall compressive strength characteristic of said structure leveling device; and

said integral plastic member having a front edge and a rear edge, said rear edge being greater in height than said front edge, locking means located directly adjacent said rear edge, said locking means being adapted to interconnect with a separate attachment providing a still further level of a different height, said locking means comprising a pair of said grooves with one of said groove being formed within one said side wall and the other said groove formed within the opposite said side wall.

---

[15] Rhino seeks judgment on Berg's claim that another prior patent (patent no. 332,928, hereinafter "the '928 patent") anticipated Rhino's design.  Berg's brief in opposition (Doc. 79) did not address the '928 patent.  <u>See</u> L.R. 7.6.  In addition, Berg admits that the '928 patent was filed almost a year after the '889 patent (Doc. 34 ¶ 36; Doc. 78 ¶ 36).  Given this admission and the lack of argument to the contrary, the court finds that the '928 patent does not qualify as prior art.  Accordingly, the court will grant summary judgment on Rhino's claim that the '889 patent is not invalid as anticipated by the '928 patent.

(Doc. 79, Ex. B at cols. 3-4.)  The '501 patent also discloses, in part:

This structure leveling device is constructed in a manner to safely support the weight of a vehicle.  Also, the device is constructed to facilitate movement of a vehicle wheel onto the different levels. . . .

. . . .

The field of this invention relates to leveling devices and more particularly to a structure leveling device which is designed primarily to be used in conjunction with a vehicle such as a recreational vehicle.

. . . .

. . . An inclined ramp is formed between each directly adjacent pair of levels and also at the front edge of the device to facilitate movement of a tire of a vehicle onto each level. . . .

The primary objective of the present invention is to construct a single compact unit which is to be associated with a wheel of a vehicle to raise a portion of the vehicle to thereby locate the bed of the vehicle at a level position.

. . . .

Another objective of this invention is to construct a single integral unit which is constructed to be of substantial high strength . . . .

. . . .

. . . The tire 10 can be easily driven up onto inclined ramp 20 onto level 12 and if level 12 is not of sufficient height, the tire 10 can then be easily driven across inclined ramp 22 onto level 14.

(Doc. 79, Ex. B.)   Berg also asserts that Rhino's design is obvious under 35 U.S.C.

§ 103.  In addition, Berg argues that the '889 patent is invalid under 35 U.S.C. § 112

because it does not disclose plastic as a means for interconnecting the parts of the

ramp.  These validity issues will be addressed *seriatim*.

### 1.   __Anticipation__

Because the underlying basis for issuance of a patent is originality of design, a showing that the patented invention was wholly anticipated by a prior art reference renders the patent invalid.  <u>Akamai Techs.</u>, 344 F.3d at 1193-94.  To establish anticipation of an existing patent, the burden is on the challenging party to show, by clear and convincing evidence, that "every limitation in a claim is found in a single prior art reference, either explicitly or inherently."  <u>Impax Labs., Inc. v. Aventis Pharms. Inc.</u>, 468 F.3d 1366, 1381 (Fed. Cir. 2006).  Inherent anticipation occurs when "the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art."  <u>Trintec Indus., Inc. v. Top-U.S.A. Corp.</u>, 295 F.3d 1292, 1295 (Fed. Cir. 2002).

In the matter *sub judice*, Berg argues that the '501 patent anticipated Rhino's design, i.e., the '889 patent.  The court disagrees and finds that the '501 patent does not anticipate the '889 patent.  The '889 patent contains numerous limitations not found in the '501 patent, either explicitly or inherently.  First, each independent claim of the '889 patent claims a "vehicle service ramp to elevate and support vehicles that may be serviced."  (Doc. 1, Ex. A at cols. 4-6.)  The '501 patent, however, refers only to a "structure leveling device" and never mentions the ability to service a vehicle while on the claimed device.  (Doc. 79, Ex. B.)  Second, the '889 patent claims "an inclined top surface" and a "top flat plane surface."[16]  (Doc. 1,

---

[16] In claims 6 and 8, the "top flat plane surface" is referred to as a "flat top surface."  (Doc. 1, Ex. A at cols. 5-6.)

Ex. A at cols. 4-6.)  Importantly, the independent claims of the '889 patent describe a structure "that is of an incline and of sufficient height that motor vehicle tires secure purchase throughout their upward travel from the lowest portion of the incline surface until the vehicles [sic] tires are resting on the flat top surface." (Doc. 1, Ex. A at cols. 4-6.)  In contrast, the '501 patent does not require that a vehicle's tires "secure purchase throughout their upward travel" and its specification reveals that the "inclined ramps . . . are not considered to be part of the upper surface of the device."  (Doc. 79, Ex. B at col. 2, lines 32-33.)   Indeed, figure 1 of the '501 patent specifically illustrates a vehicle's tire that is *not* in contact with the inclined portion of the device.  (Doc. 79, Ex. B.)  Finally, claim 1 of the '889 patent discloses a "stop means . . . situated forward of rear member and formed on its rearward surface in such a configuration to [s]tabilize the structure when transporting or storing vertically."  (Doc. 1, Ex. A at col. 5, lines 15-18.)  The '501 patent does not disclose such a stop means; it merely describes "spaced apart ridges . . . to form in essence an anti-skid surface which is caused by making the levels . . . having uneven surfaces."  (Doc. 79, Ex. B, col. 2 at 63-66.)  Accordingly, the court finds that the '501 patent does not anticipate the '889 patent and will grant summary judgment in favor of Rhino on this issue.

2.    **Obviousness**

Berg also argues that the "stop means" disclosed in claim 1 of the '889 is obvious.  A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would

have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a).  A patent is presumed valid and, as with a claim of anticipation, "there must be clear and convincing evidence supporting the obviousness determination." SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp., 225 F.3d 1349, 1355 (Fed. Cir. 2000).  In the matter *sub judice*, Berg offers no evidence, and the court finds none, that the "stop means" of the '889 patent was obvious. Interestingly, Berg does not offer any prior art to argue that the '889 patent is obvious.  See 35 U.S.C. § 103(a) (comparing the differences between "the subject matter sought to be patented" and "prior art" to determine the obviousness issue). Berg merely argues that a "stop means" is obvious in light of Rhino's purpose "to prevent a vehicle from driving off the end of the device."  (Doc. 79 at 9.)  Clearly, obviousness cannot be judged on the basis of the challenged patent alone. See 35 U.S.C. § 103(a).  Accordingly, the court finds that the presumption of validity has not been rebutted by clear and convincing evidence and will grant summary judgment in favor of Rhino on the obviousness claim regarding the "stop means."

3.     **35 U.S.C. § 112**

Section 112 requires a patent's specification to

contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.

35 U.S.C. § 112.  Berg asserts that the '889 patent is invalid under this section because it does not disclose plastic as a means for interconnecting the parts of the

25

ramp.  However, as discussed <u>supra</u> Part III.A.3, the court finds that the

specification clearly discloses a plastic molded ramp such that one skilled in the art

would determine that plastic is a means for interconnecting the parts of the ramp.

Accordingly, the court will grant summary judgment in favor of Rhino on Berg's

claim that the '889 patent is invalid under 35 U.S.C. § 112.

In the matter *sub judice*, Berg presents no other prior art to demonstrate that

the '889 patent is invalid.  However, Berg did not have the benefit of the court's

claim construction to evaluate prior art.  Therefore, the court is reluctant to

foreclose the possibility that other prior art may invalidate the '889 patent.

Accordingly, the court will grant in part and deny in part Rhino's motion for

summary judgment of validity and permit Berg and Cencor to raise this issue before

trial.

**C.**    **Infringement**[17]

The appropriate construction of claim language, as a matter of law, provides

the basis on which the jury may determine, as a matter of fact, whether the

---

[17] In its brief in opposition to the motion for summary judgment of infringement, Berg states that it "hereby submits a cross-motion for summary judgment of non-infringement."  (Doc. 75 at 1.)  This statement in a brief in opposition is insufficient to seek summary judgment.  <u>See</u> L.R. 7.1 (requiring all motions to be written and accompanied by a certificate of concurrence or non-concurrence).  During oral argument on the motions for summary judgment, the court informed Berg that a separate motion was required in accordance with Local Rule 56.1.  (Doc. 91 at 85-89.)  Berg never filed a separate motion in accordance with the Local Rules and, therefore, a motion for summary judgment of non-infringement by Berg is not presently before the court.

challenged product infringes either literally or equivalently[18] on the patented

invention.  K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1366 (Fed. Cir. 1999).  "Literal

infringement requires that each and every claim limitation be present in the

accused product."  Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc., 467 F.3d

1370, 1378 (Fed. Cir. 2006).  If even one claim limitation within the asserted claim is

not found in the accused product, there can be no literal infringement.  See

MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005).

In the matter *sub judice*, each of the claims at issue include the "structure

that is essentially one piece" limitation.  Berg contends that its ramps are not

structures that are "essentially one piece," construed supra Part III.A.4 as "a

structure that is basically, fundamentally, substantially, or virtually a single piece

after being constructed or assembled with (1) screws and a waterproof glue type

compound, (2) plastic, or (3) their equivalents."  Given that the Berg ramps are

comprised of multiple components, two of which are joined together by dowel and

pin structure, and can be disassembled, a reasonable jury could conclude that these

---

[18] In its motion for summary judgment of infringement, Rhino does not argue
that the Berg ramps infringe the '889 patent under the doctrine of equivalents.  (See
Docs. 31, 81).  Therefore, the court will address only literal infringement at this
summary judgment stage.

ramps are not "essentially one piece."  Accordingly, the court will deny Rhino's

motion for summary judgment of infringement.[19]

## IV.   <u>Conclusion</u>

The court will construe the disputed claims as set forth above.  In addition,

for the reasons set forth above, the court will grant in part and deny in part Rhino's

motion for summary judgment of validity and enforceability and deny Rhino's

motions for summary judgment of infringement and willfulness.

An appropriate order will issue.


<u>  S/ Christopher C. Conner  </u>
CHRISTOPHER C. CONNER
United States District Judge


Dated:       March 29, 2007

---

[19] Rhino also seeks summary judgment on its claim that Berg willfully
infringed the '889 patent.  However, Rhino's motion for summary judgment of
willfulness is "based on the assumption that this Court will grant Rhino's
concurrent motions for summary judgment that the '889 patent is valid and
infringed by Berg."  (Doc. 29 at 2.)  The court finds that a reasonable jury could
conclude that the Berg ramps do not infringe the '889 patent and, therefore, will
deny Rhino's motion for summary judgment of willful infringement.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RHINO ASSOCIATES, L.P.,** | : | **CIVIL ACTION NO. 1:04-CV-1611** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **BERG MANUFACTURING AND** | : | |
| **SALES CORPORATION and** | : | |
| **CENCOR PLASTICS,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER**

AND NOW, this 29th day of March, 2007, upon consideration the parties'
contentions regarding the proper construction of claim terms, and plaintiff's
motions for summary judgment (Docs. 26, 27, 28), and for the reasons set forth in
the accompanying memorandum, it is hereby ORDERED that:

1.  The disputed claim terms shall be construed as described in the
    accompanying memorandum.

2.  The motion for summary judgment of willfulness (Doc. 26) is DENIED.

3.  The motion for summary judgment of validity and enforceability
    (Doc. 27) is GRANTED in part and DENIED in part as follows:

    a.  Berg Manufacturing and Sales Corporation's counterclaim that
        the patent is unenforceable due to inequitable conduct is
        DISMISSED.

    b.  The motion for summary judgment (Doc. 27) is GRANTED in
        favor of Rhino Associates, L.P. with respect to the following
        claims of Rhino Associates, L.P.:

        i.  Patent no. 4,836,501 does not anticipate patent no.
            Re. 34,889.

       ii.      Patent no. 332,928 does not anticipate patent no. Re. 34,889.

       iii.     The "stop means" disclosed in claim 1 of patent no. Re. 34,889 is not obvious.

       iv.     Patent no. Re. 34,889 is not invalid under 35 U.S.C. § 112.

c.     The motion for summary judgment (Doc. 27) is otherwise DENIED.

d.     Defendants shall be permitted to file, on or before April 23, 2007, a joint motion for summary judgment of invalidity, supporting brief, <u>and</u> statement of material facts, <u>limited solely to arguments of invalidity based on prior art</u>.  See L.R. 56.1. <u>Failure to file a motion for summary judgment of invalidity will preclude defendants from raising this issue at trial</u>.

       i.      Plaintiff shall file, on or before May 7, 2007, a brief in opposition and responsive statement of material facts to any motion for summary judgment of invalidity.  See L.R. 7.6; 56.1.

       ii.     Defendants shall be permitted to file, on or before May 14, 2007, a brief in reply.

4.     The motion for summary judgment of infringement (Doc. 28) is DENIED.

5.     The Clerk of Court is directed to defer the entry of judgment until the conclusion of this case.

6.     A revised pretrial and trial schedule will issue by future order of court.


                <u> S/ Christopher C. Conner   </u>
                CHRISTOPHER C. CONNER
                United States District Judge